# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**STEVEN C. KOEPP**
        **Plaintiff,**

    **v.**                                   **Case No. 10-C-1002**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Steven Koepp seeks judicial review of the denial of his application for social security disability benefits. <u>See</u> 42 U.S.C. § 405(g). Plaintiff claimed inability to work due to spine and eye problems (Tr. at 106, 109, 126, 130), but the Social Security Administration ("SSA") denied his application initially (Tr. at 48) and on reconsideration (Tr. at 49), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 50). The SSA's Appeals Council declined plaintiff's request for review (Tr. at 1), making the ALJ's decision the final determination on plaintiff's application for purposes of judicial review. <u>See</u> <u>Getch v. Astrue</u>, 539 F.3d 473, 480 (7th Cir. 2008).

On review of the parties' briefs and the administrative record, I find the ALJ's decision deficient in several respects. While perhaps none of these deficiencies standing alone would require reversal, the cascading effect of the ALJ's errors and omissions necessitates remand for further proceedings. I first set forth the applicable legal standards, then review the evidence of record, and, finally, consider plaintiff's specific allegations of error.

# I. APPLICABLE LEGAL STANDARDS

## A.    Judicial Review

In reviewing an ALJ's decision under § 405(g), the court does not re-determine whether the claimant is disabled.  Rather, the court asks whether the ALJ's decision to deny the claim was supported by "substantial evidence" in the case record and based on the proper legal criteria.  See, e.g., Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011); Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010); Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010).  Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ.  Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997).  The court must conduct a critical review of the entire record, but it may not decide the facts anew, re-weigh the evidence, re-determine credibility, or otherwise substitute its judgment for that of the ALJ.  See, e.g., McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011); Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009); Powers v. Apfel, 207 F.3d 431, 434-35 (7th Cir. 2000).

However, this deferential standard of review assumes that the ALJ has actually addressed the important evidence and adequately considered the issues.  See, e.g., McKinzey, 641 F.3d at 889.  While the ALJ need not mention every piece of evidence in the record, he must provide an "accurate and logical bridge" between the evidence and the conclusion; only then may the reviewing court assess the validity of his ultimate finding and afford the claimant meaningful judicial review.  Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008).  Further,

because judicial review is limited to the reasons provided by the ALJ in his decision, the Commissioner's lawyers may not fill in any gaps in the ALJ's analysis. See, e.g., Campbell, 627 F.3d at 306 (citing Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010)). Finally, if the ALJ commits an error of law, such as violating the agency's Rulings and regulations for evaluating disability claims, see Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991), the court may reverse without regard to the volume of evidence in support of the factual findings, White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999).

## B.    Disability Standard

In determining whether a claimant is disabled, the ALJ applies a sequential, five-step test, see 20 C.F.R. §§ 404.1520, 416.920, asking (1) whether the claimant is currently working; (2) if not, whether the claimant has a severe impairment;[1] (3) if so, whether the claimant's impairment meets or equals one of the impairments considered presumptively disabling in SSA regulations;[2] (4) if not, whether the claimant can, given his residual functional capacity ("RFC"),[3] perform his past relevant work; and (5) if not, whether the claimant is able to perform any other work in the national economy. See, e. g., Simila v. Astrue, 573 F.3d 503, 512-13 (7th Cir. 2009). The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the agency to show that the claimant can make the

---

[1]An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c);1521(a).

[2]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

[3]RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p.

adjustment to other work.  See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The agency may carry this burden either by relying on the testimony of a vocational expert

("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use

of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2,

a chart that classifies a person as disabled or not disabled based on his exertional ability, age,

education, and work experience.  See, e.g., Neave v. Astrue, 507 F. Supp. 2d 948, 953 (E.D.

Wis. 2007).

## II.  FACTS AND BACKGROUND

### A.  Treatment Records

On January 24, 2002, while an inmate in the New York prison system, plaintiff saw a

rheumatologist, complaining of back pain for several years, much worse for the last several

months.  He also reported recurrent pain and redness in both eyes.  (Tr. at 167.)  Examination

of the spine revealed pain on flexion and extension, with mild limitation on full extension and

lateral movement.  An x-ray from 2000 showed sacroiliitis, bilateral inflammation, and narrowing

of the sacroiliac spine.  The doctor wrote that the "whole picture is consistent with the diagnosis

of ankylosing spondylitis."[4]  (Tr. at 168.)  The doctor prescribed arthrotec for symptomatic relief,

started plaintiff on Enbrel injections twice weekly, and ordered an x-ray and various tests.  (Tr.

at 168.)

Released from prison in July 2007, on February 15, 2008, plaintiff saw Dr. Rodney

Mayhorn to establish care, complaining of joint pain.  Plaintiff noted that while incarcerated he

---

[4]"Ankylosing spondylitis is a long-term disease that causes inflammation of the joints
between the spinal bones, and the joints between the spine and pelvis."
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001457/.

was tried on methotrexate and arthrotec, with poor relief of his symptoms. He also reported a history of iritis and cataracts, with one lens replacement, as well as a history of mastoiditis and persistent tinnitus. Dr. Mayhorn assessed rheumatoid arthritis and provided a trial of ibuprofen, tramadol, and Tylenol #3. He also referred plaintiff to rheumatology and the eye institute at Froedert Hospital. (Tr. at 392.)

On March 3, 2008, plaintiff returned to Dr. Mayhorn for follow-up, reporting that the pain medications provided little relief. He also complained of some right-sided ear and ear skin discomfort. His back pain was essentially unchanged. Dr. Mayhorn provided a trial of vicodin. (Tr. at 391.)

On May 8, 2008, plaintiff underwent testing related to his history of mastoiditis and current otalgia (i.e., earache). The testing showed a displaced tympanostomy tube in his left auditory canal but was otherwise normal. (Tr. at 216-17.)

On May 16, 2008, plaintiff saw Dr. Ann Rosenthal, a rheumatologist, on referral from Dr. Mayhorn, for evaluation of ankylosing spondylitis ("AS") and rheumatoid arthritis ("RA"). He reported having back problems for fifteen years, starting in high school. After he was sentenced to prison in 2001, doctors placed him methotrexate, and he felt better. However, he stopped taking this drug after he developed headaches and mastoiditis. (Tr. at 260.) Following his release from prison, he saw Dr. Mayhorn, who put him on vicodin, tramadol, and ibuprofen. He reported that he woke up really sore but felt better after taking vicodin. He complained of pain in his neck, shoulder, and back. Plaintiff also reported a history of iritis, which began six to seven years ago. He eventually lost vision in his left eye and underwent cataract surgery and lens implant about four years ago. He reported using eye drops since then. He had, since his release from prison, been seen in the eye clinic and found stable.

Finally, plaintiff reported a feeling of things crawling around his head. (Tr. at 261.) Regarding his social history, plaintiff reported graduating high school but had little work experience. After serving seven years in prison he moved in with his mother, had no income, and was trying to get SSI. He reported laying down half the day. He stated that if he could not get disability he would be interested in clerical work, although he believed his poor vision would preclude this. On exam, Dr. Rosenthal noted restricted range of motion of the neck, a shoulder tender and painful with external rotation, and full range of motion of the lumbar spine. Dr. Rosenthal saw no evidence of RA, but found plaintiff's symptoms consistent with AS. He was quite symptomatic with elevated inflammatory markers. (Tr. at 262.) Dr. Rosenthal re-started plaintiff on arthrotec and methotrexate and ordered x-rays. (Tr. at 263.)

The x-rays, taken on May 16, 2008, revealed mild degenerative changes at L2-L3 and L3-L4, erosive disease involving both sacroiliac joints, and hips normally located. (Tr. at 212, 265.) X-rays of the shoulders were unremarkable. (Tr. at 214, 265.)

On June 20, 2008, plaintiff returned to Dr. Rosenthal, doing okay since his last visit and tolerating the methotrexate well. He still had morning stiffness, lasting about ninety minutes, as well as pain in his back, neck, and hips sporadically morning and night. He reported that he ran out of vicodin seven to ten days ago and had been having trouble sleeping. (Tr. at 252.) On exam, Dr. Rosenthal noted some discomfort with external rotation of both hips, some tenderness and restricted range of motion in the lumbar spine, but his neck had excellent range of motion and he displayed normal strength and alignment. (Tr. at 253.) Because plaintiff tolerated methotrexate well but noted little difference in his symptoms, Dr. Rosenthal increased the dose and also refilled vicodin. (Tr. at 254.)

On August 1, 2008, plaintiff advised Dr. Rosenthal that he was doing a little better since

6

his last visit.  He reported some morning pain in the back, neck, and hips, but not much pain during the day.  He continued to tolerate the methotrexate well, with no side effects.  He reported taking four vicodin per day, rarely six.  (Tr. at 244.)  On exam, he generally had full range of motion of the neck and shoulders, his hips moved well, slight tenderness over the L-SI joint, but otherwise full range of motion of the back. (Tr. at 245.)  As plaintiff appeared to be doing better on methotrexate, Dr. Rosenthal continued the medication.  (Tr. at 246.)

Plaintiff returned to Dr. Mayhorn on August 13, 2008, reporting that his back pain was stable.  He complained of ringing in the ears, for which he was referred to neurology.  (Tr. at 390.)

On October 3, 2008, plaintiff saw Dr. Rosenthal for follow-up, doing okay since his last visit.  He reported about thirty minutes of morning stiffness, mostly in the back and neck, with some pain in the same areas around 6 p.m.  He took four to six vicodin per day.  Pleased with the effects of methotrexate and doing well on his current regimen, Dr. Rosenthal made no changes.  (Tr. at 236-38.)

On October 24, 2008, plaintiff saw Dr. Helen Lin, a neurologist, regarding his disturbance of skin sensation.  (Tr. at 328.)  Plaintiff advised that while in prison in October 2006 he developed a left ear infection, which went untreated and developed into mastoiditis. He eventually had a myringotomy done and since then had constant whistling and ringing in the ear.  Plaintiff also complained of a crawling sensation and band-like pressure around his head.  A CT of the temporal bones showed a displaced tympanostomy tube.  (Tr. at 329.)  A neurologioc exam was non-focal, so Dr. Lin ordered an MRI to assess for an intracranial lesion. (Tr. at 331.)  The MRI, completed on October 29, 2008, revealed subtle areas of abnormal signal involving the posterior aspect of the right insular cortex.  The reviewing physician

reported that differential possibilities include atypical presentation of demyelinating disease, other inflammatory disorders, and infiltrative disorders. (Tr. at 210-11.) Plaintiff underwent another MRI on November 10, 2008, on which the signal abnormality in the medulla on the right remained unchanged. The scan revealed no long TR signal abnormalities within the cervical cord and multi-level degenerative disc disease without significant spinal canal or neural foramina narrowing. (Tr. at 208.)

Plaintiff returned to Dr. Lin on December 4, 2008, reporting that his skin sensation symptoms were bothersome but did not limit his daily activities. (Tr. at 327.) Dr. Lin noted that methotrexate had been cited to cause CNS toxicity, including demyelination. However, given plaintiff's history of incarceration and untreated ear infection, infectious or post-infectious etiologies had to be ruled out. She ordered repeat MRI and other testing and provided neurontin for symptomatic relief. (Tr. at 328.) A repeat MRI conducted on December 12, 2008, revealed long TR signal abnormality in the right lateral medulla, right posterior insula, and in the periaqueductal region, relatively unchanged since last the scan. The reviewing physician indicated that this raised suspicion of demyelinating disease. (Tr. at 203-04.) On December 18, 2008, plaintiff saw Dr. Lin for a "lumbar puncture." (Tr. at 326.)

Plaintiff returned to Dr. Rosenthal on January 9, 2009, complaining of some upper back and neck pain and recurrent bronchitis-like symptoms (Tr. at 226), otherwise doing okay since his last visit. He reported that his arthritis had been pretty good, with morning stiffness lasting sixty to ninety minutes and no swelling. Most of his pain was in the back, neck, and shoulders; his hips hurt occasionally. He reported moderate energy levels and sleeping pretty well. His major complaint was a bad cough for several weeks. (Tr. at 226-27.) Dr. Rosenthal found plaintiff doing really well symptom-wise on methotrexate, which she continued. She prescribed

8

zithromax for the cough.  (Tr. at 229.)

On February 24, 2009, plaintiff saw Dr. Lin for neurologic follow-up, reporting that his most bothersome symptom was a band-like feeling of pressure around his head.  The associated paresthesias were less bothersome, though they did increase in whatever area he rested his head on the pillow.  He reported that he did not tolerate a number of neuropathic medications due primarily to sexual side effects.  He denied any new weakness, numbness, or visual changes.  Dr. Lin listed a diagnosis of head pressure, suspicious for musculoskeletal origin.  (Tr. at 325.)  She noted that he was already taking NSAIDs for rheumatologic reasons and provided samples of zanaflex for relief.  She noted that the etiology of plaintiff's CNS lesions was uncertain.  Other tests revealed no current evidence of demyelinating disease, infection, or malignant cells.  She continued to monitor his symptoms, with a repeat MRI in a few weeks.  (Tr. at 325-26.)

On May 8, 2009, plaintiff returned to Dr. Rosenthal, doing pretty well since his last visit. His arthritis had been good, with morning stiffness lasting about sixty to ninety minutes.  His pain was tolerable and in the upper back and neck.  Most days he was pretty comfortable, but mornings were bad.  (Tr. at 349.)  On exam, he had full range of motion of the extremities.  (Tr. at 351.)  Dr. Rosenthal noted plaintiff's AS to be very stable, and she made no changes in his medications.  (Tr. at 352.)

On August 27, 2009, plaintiff saw Dr. Mayhorn, who noted stable hip degenerative joint disease.  Plaintiff was to follow the medication regimen prescribed by rheumatology.  (Tr. at 389.)

On September 4, 2009, plaintiff returned to Dr. Rosenthal, doing worse since his last visit.  His neck was very stiff, and he reported a burning sensation in his shoulders and upper

back. He reported severe morning stiffness lasting about two hours and being very restless during the day; moving helped a little. He reported taking his pain pills every six hours, but they only helped a little. (Tr. at 361.) As plaintiff continued to have significant symptoms on methotrexate, Dr. Rosenthal wanted to try a TNF alpha inhibitor. (Tr. at 363.)

On September 8, 2009, Dr. Rosenthal prepared a letter, indicating that plaintiff was under her care for ankylosing spondylitis, which caused him daily severe discomfort and interfered with his ability to concentrate, rest comfortably at night, move with ease, or sit still for longer than ten minutes. She indicated that he was unable to lift more than five pounds. He took pain medications every six hours during the day, which may interfere with his levels of consciousness and mental performance. She concluded that "his ankylosing spondylitis currently significantly interferes with his ability to work." (Tr. at 342.)

On September 18, 2009, plaintiff underwent x-rays, which revealed possible lung disease. (Tr. at 383.) However, the transcript contains no further records regarding this condition.

## B.    SSA/State Agency Consultants' Reports

On September 28, 2007, Dr. Abdul Hafeez evaluated plaintiff for the state reviewing agency and completed a disability report. (Tr. at 169-70.) On exam, plaintiff was able to flex his back to 60 degrees; his gait was normal; and he had some problems extending his back but not to a significant degree. Vision in the left eye was 20/100, but 20/20 in the right. Dr. Hafeez saw no signs of active rheumatoid arthritis. (Tr. at 171.) Dr. Hafeez ordered an x-ray, which revealed bilateral sacoiliitis consistent with the diagnosis of ankylosing spondylitis. (Tr. at 173.)

On October 15, 2007, Dr. Michael Baumblatt completed a physical RFC assessment

form, finding plaintiff capable of light work exertionally (Tr. at 175), with additional postural limitations, i.e. only occasional kneeling or crouching (Tr. at 176). He assessed no visual or other limitations. (Tr. at 177-78.) On January 18, 2008, and January 31, 2008, Dr. Bernard Stevens and Dr. Jerda Riley affirmed Dr. Baumblatt's RFC assessment. (Tr. at 186-87.)

## C.   Hearing Testimony

### 1.    Plaintiff

Plaintiff testified that he last worked as a cook in 1996. (Tr. at 23.) While in prison on an attempted murder conviction, he obtained his high school diploma and worked about four hours per day in the prison law library and laundry. (Tr. at 17-18, 20.) Following his 2007 release, he moved in with his mother and did very little. (Tr. at 16-17.) He had not sought work since his release (Tr. at 27), and he engaged in no outside activities like sports or exercise (Tr. at 28-29). He testified that he watched TV, read, used the computer, talked on the phone, and played guitar. He stated that he could sit for twenty to thirty minutes before he had to get up and stretch. He stated that he could look at a computer screen for about ½ hour before it bothered his eyes. He testified that he wore sunglasses to protect his eyes whenever the lights were on. (Tr. at 21.) Plaintiff indicated that he had cataract surgery on his left eye when he was in prison.[5] (Tr. at 21-22.) He stated that he had a license and was able to drive, although his peripheral vision on the left side was poor. He stated that he was able to read but used his right eye; he could not make out letters with his left eye. (Tr. at 23.) He could read for about ½ hour. (Tr. at 31.) He stated that he covered the left eye with a patch when he had a flare-up of iritis. (Tr. at 23.) He also experienced iritis in his right eye, but it did not require treatment

---

[5]While he was in prison, he also had mastoiditis, for which he was provided antibiotics. (Tr. at 35.)

11

yet.  (Tr. at 35.)

Plaintiff testified that his back problem was diagnosed in about 2004, but he had been having such problems since age fifteen.  (Tr. at 24.)  He received treatment for the condition in prison and currently took vicodin and other medications, with side effects of drowsiness.  (Tr. at 25.)  Plaintiff testified to pain in his spine, shoulders, neck, and hips.  (Tr. at 25.)  The pain was worsened by lack of motion, such as when he tried to sleep.  (Tr. at 26.)

Plaintiff estimated that he could walk thirty to forty minutes at a slow pace, ten minutes at a fast pace.  He could not lift more than five or ten pounds.  (Tr. at 29.)  He had no trouble with his grip but could not bend or kneel.  (Tr. at 29-30.)  He could rotate his neck but had trouble with his shoulders when reaching.  (Tr. at 30-31.)  With certain ranges of motion, his shoulders would dislocate.  (Tr. at 33-34.)  He stated that he took two naps per day.  (Tr. at 32.)  He also had an undiagnosed "white spot" on his brain and an unidentified problem with his lungs.  (Tr. at 36.)

### 2. VE

The VE[6] testified – and plaintiff's counsel and the ALJ agreed – that plaintiff had no past relevant work history.  (Tr. at 40.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, who could work at the light exertional

---

[6]There is some confusion about the VE's identity.  In listing the appearances, the hearing transcript identifies the VE as "Alex Paterro" (Tr. at 11), and the ALJ in introducing the persons present at the hearing likewise stated that the vocational expert was Alex Paterro (Tr. at 13). The ALJ also referred to "Mr. Paterro" when questioning the VE.  (Tr. at 38.)  However, the VE testified that his qualifications were set forth in exhibit 7B (Tr. at 39), which is the resume of an "Allen R. Searles."  (Tr. at 103.)  Prior to the hearing, the ALJ summoned Allen R. Searles to testify as a vocational expert (Tr. at 101), and in his decision the ALJ identified the VE as Allen R. Searles.  (Tr. at 53).  When swearing in the witnesses at the hearing, the ALJ, according to the transcript, referred to a "Mr. Seals."  (Tr. at 16.)  Nevertheless, plaintiff's counsel stated that she had no objection to the VE's qualifications.  (Tr. at 40.)

level, with occasional stooping and crouching. The VE testified that such a person could work as a mail clerk, counter clerk, and cashier. (Tr. at 41-42.) If the person had additional postural limitations of no climbing ladders, ropes or scaffolds, occasional use of ramps and stairs, occasional kneeling and crawling, and occasional reaching bilaterally, the person could still perform these jobs. (Tr. at 42.) Adding a limitation of occasional peripheral vision, the jobs would still be available. If the person was limited to sedentary work, these jobs would not be available, but there would be others, such as order clerk, escort vehicle driver, and call-out operator, the person could do. (Tr. at 42.) Finally, if, due to severe pain, the person could not engage in sustained work activity on a consistent, daily basis, all work in the competitive labor market would be eliminated. (Tr. at 43.) The VE indicated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 43.)

On questioning by plaintiff's counsel, the VE testified that if the person could lift no more than five pounds, all work in the competitive labor market would be eliminated. An employer would tolerate one absence per month, twelve per year. (Tr. at 43.) An employer would not tolerate a worker who started the day but had to leave due to a headache. (Tr. at 43-44.)

**D.    ALJ's Decision**

Following the five-step process, the ALJ found that plaintiff had not worked since the date of his application, and that he had the severe impairments of ankylosing spondylitis and iritis with a history of left eye cataract surgery. (Tr. at 55.) On review of the medical evidence and reports of treating and examining physicians, the ALJ concluded that neither impairment met a Listing. (Tr. at 55-57.) The ALJ then determined that plaintiff retained the RFC for light work with non-exertional limitations of no climbing of ladders, ropes, or scaffolds; occasional climbing of stairs or ramps; occasional stooping, crouching, kneeling, and crawling; occasional

13

bilateral overhead reaching; and only occasional need for peripheral visual acuity. (Tr. at 57.) In making this finding, the ALJ considered plaintiff's testimony regarding his symptoms, finding his claims inconsistent with the medical and other evidence of record. (Tr. at 57-58.) The ALJ also considered the letter-report from Dr. Rosenthal, declining to give weight to her opinions regarding plaintiff's diminished ability to lift, sit, and concentrate based on medication side effects. (Tr. at 58-59.)

Because plaintiff had no past relevant work experience, the ALJ proceeded to step five where, relying on the VE's testimony, he concluded that there are jobs that exist in significant numbers in the national economy that plaintiff could perform. (Tr. at 59.) Specifically, the VE testified that a person with plaintiff's RFC could work as a mail clerk (3300 jobs in Wisconsin), counter clerk (8110 jobs), and cashier (63,700 jobs). The ALJ therefore found plaintiff not disabled. (Tr. at 60.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in considering the credibility of the testimony, medical equivalence with the Listings, and Dr. Rosenthal's report. He further argues that the ALJ erred at step five because the record fails to establish the identity and qualifications of the VE upon whom the ALJ relied.

### A. Credibility

A social security claimant cannot establish disability based solely on his own statements about his symptoms and limitations. See SSR 96-4p ("No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings

demonstrating the existence of a medically determinable physical or mental impairment.").

However, once the claimant has medically established the existence of a severe impairment, the ALJ must consider the claimant's statements about his symptoms and their effect on ability to do basic work activities. SSR 96-7p. "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." Id.

In evaluating the credibility of a claimant's testimony, the ALJ must follow a two-step process. The ALJ must first determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms the claimant alleges. If not, the symptoms cannot be found to affect his ability to work. SSR 96-7p. However, if the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must determine the extent to which the symptoms limit the claimant's ability to work. SSR 96-7p. In making this second-step determination, the ALJ may not discredit the claimant's statements based solely on a lack of support in the medical evidence. Moss, 555 F.3d at 561. Rather, the ALJ must consider the entire record, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The reviewing court, in recognition of the ALJ's opportunity to observe the claimant while testifying, must afford his credibility determination special deference, Castile, 617 F.3d at 928-29, and will ordinarily reverse only if the determination is patently wrong, Jones v. Astrue,

15

623 F.3d 1155, 1160 (7th Cir. 2010).  However, this deferential standard applies only if the ALJ

actually made an explicit credibility finding, <u>McQuestion v. Astrue</u>, 629 F. Supp. 2d 887, 896

(E.D. Wis. 2009) (citing <u>Schroeter v. Sullivan</u>, 977 F.2d 391, 394-95 (7th Cir. 1992)), justified

by "specific reasons" and including "a logical bridge between the evidence and his conclusion

that [the claimant's] testimony was not credible," <u>Villano v. Astrue</u>, 556 F.3d 558, 562 (7th Cir.

2009).  Further, where the credibility determination is based on objective factors rather than

subjective considerations such as demeanor, the court has greater freedom to review the ALJ's

decision.  <u>Craft</u>, 539 F.3d at 678.

Here, the ALJ stated that in determining RFC  he had "considered all symptoms and the

extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence."  (Tr. at 57.)  He then set forth the two-step test from

SSR 96-7p (Tr. at 57-58) and stated as follows:

> Asked about his energy level, claimant testified that when he reads and plays the
> guitar, he can only do so for about 30 minutes before becoming very tired.
> However, claimant has not presented any medical evidence from a treating
> source advising him to stop the activity after 30 minutes.  He takes about two
> naps a day for about three hours but did not indicate when he started napping in
> this manner and the claimant points to no such evidence in the record.  The
> claimant's allegations that he can lift only five pounds [are] not supported by the
> medical evidence and no functional testing has been performed to establish that
> he could only lift five pounds . . . . Although claimant states that he experiences
> headache pain, he has not provided any evidence of how this alleged headache
> pain affects his ability to work.  There is no evidence in the record that any
> physician, whether treating or evaluating, has determined claimant's headache
> pain limits his ability to work.  Furthermore, during the October 14, 2009 hearing
> claimant neither testified to any limitations with respect to his headache pain, nor
> did his attorney question him with regard to any possible headache pain
> limitations.  The course of medical treatment and use of medication in this case
> since January 2002 (the alleged disability onset date) did not validate allegations
> of disabling physical symptoms.

(Tr. at 58.)

The ALJ did not clearly state whether he found that plaintiff's impairments could cause the symptoms alleged. This violation of SSR 96-7p's first step makes it impossible to trace the path of the ALJ's reasoning. The ALJ doubted plaintiff's testimony regarding his energy level, napping, lifting ability, and headache pain, but in each instance the ALJ relied on a lack of support in the objective medical evidence. Assuming the ALJ found that plaintiff's impairments could produce the symptoms, he was forbidden from rejecting plaintiff's testimony based solely on a lack of support in the medical evidence.[7] See Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009).

The ALJ also faulted plaintiff for failing to provide evidence as to how his headache pain affected his ability to work. But plaintiff testified that he got headaches when he tried to read (Tr. at 22), which he could only do for about ½ hour (Tr. at 31). Plaintiff admitted that he considered clerical work, but testified that he could not do it because of his eyes and worsening headaches. (Tr. at 27.) Plaintiff discussed these issues with his doctors. During his initial evaluation with Dr. Rosenthal in May 2008, plaintiff stated that "he thinks his poor vision would preclude" clerical work. (Tr. at 262.) In September 2009, he told Dr. Rosenthal that he "still has a lot of headaches." (Tr. at 361.) Such limitations on plaintiff's ability to focus and read arising from his eye problems and headaches may impact his ability to work as a mail clerk,

---

[7]This is not to say that an ALJ may not consider the lack of objective medical support for the claimant's allegations. In some cases, pain may have an objectively verifiable source and, if so, the absence of objective indicators may make the claimant's testimony less plausible. See Parker v. Astrue, 597 F.3d 920, 922-23 (7th Cir. 2010). However, the ALJ must, in addition to considering all of the other evidence, explain any such finding, which did not happen here.

counter clerk, and cashier, the jobs identified by the ALJ at step five.[8]

The ALJ concluded that the "course of medical treatment and use of medication in this case since January 2002 (the alleged disability onset date) did not validate allegations of disabling physical symptoms." (Tr. at 58.) However, as noted above, at step two of the SSR 96-7p process, the claimant need not validate his symptoms with objective medical evidence. Rather, the ALJ is at that step supposed to evaluate credibility based on the entire record and, specifically, the seven factors set forth in SSR 96-7p. Further, the ALJ ignored the fact that, while the medical notes initially show a good response to methotrexate, by September 2009 plaintiff reported doing worse. Because plaintiff continued to have significant symptoms on methotrexate, Dr. Rosenthal elected to try a new medication. (Tr. at 363.) The ALJ also erred in stating that Dr. Rosenthal found that plaintiff did not need to lie down, contrary to plaintiff's testimony that he needed to lie down up to three hours. (Tr. at 58.) As the Commissioner concedes, Dr. Rosenthal did not state that plaintiff did not need to lie down.

The Commissioner correctly notes that just because a condition could cause certain symptoms or limitations does not mean that the ALJ is required to accept a claimant's testimony that he suffers from them. Schmidt v. Barnhart, 395 F.3d 737, 745-46 (7th Cir. 2005). However, the ALJ must follow the regulations in assessing credibility, including the requirement that he base his determination on the entire record, not just the objective medical evidence.[9] The matter must be remanded for reevaluation of plaintiff's credibility.

_____

[8]As discussed below, this testimony is also relevant to the issue of medical equivalence with Listing 14.09D.

[9]Earlier in his decision, the ALJ noted that while plaintiff had not engaged in post-application employment, he did work various jobs in prison, about four hours per day, in addition to earning a GED. The ALJ stated that these "post-onset work efforts are relevant

## B.    Medical Equivalence

At step three of the disability evaluation process, the ALJ must determine whether the claimant's impairments meet or equal one of those listed impairments considered presumptively disabling. See, e.g., Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). In considering whether a claimant's condition meets or equals a listed impairment, the ALJ must discuss the Listing by name and offer more than a perfunctory analysis. Id.

In order to "meet" a Listing, the claimant must present evidence establishing all of its specific "criteria." See, e.g., Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). A claimant may also demonstrate presumptive disability by showing that his impairment is accompanied by symptoms that are "equal" in severity to those described in a specific Listing. Barnett, 381 F.3d at 668 (citing 20 C.F.R. § 404.1526(a)). A claimant can demonstrate medical equivalence in three ways: (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria; (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment. 20 C.F.R. § 404.1526(b). The SSA considers

_____

evidence to the evaluation of [plaintiff's] subjective complaints even though not qualifying as substantial gainful activity." (Tr. at 55.) However, the ALJ never explained how these activities impacted plaintiff's credibility. See also Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under SSR 96-8p, ability to work only part-time mandates disability finding).

medical equivalence based on all evidence in the case record about the claimant's impairments and their effects. Id. § 404.1526(c). However, the SSA will not substitute a claimant's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of his impairments to that of a listed impairment. Id. § 404.1529(d)(3). If the symptoms, signs, and laboratory findings of the claimant's impairment(s) are equivalent in severity to those of a listed impairment, he will be found disabled. If not, the SSA considers the impact of his symptoms on his RFC. Id.

Here, the ALJ stated in the heading preceding the relevant portion of his decision that plaintiff does not have an impairment or combination of impairments that meets or medically equals a Listing. (Tr. at 56.) He then discussed several specific Listings – §§ 2.00 (visual disorders), 1.02 (dysfunction of a joint), 1.04 (disorders of the spine), and 14.09 C & D (inflammatory arthritis) – finding no medical evidence that plaintiff meets those Listings. (Tr. at 56.) As plaintiff notes, however, the ALJ offered no separate analysis of medical equivalence, and an ALJ may not "simply assume[] the absence of equivalency without any relevant discussion." Barnett, 381 F.3d at 671.

But in order to demonstrate reversible error at this point, plaintiff must do more than simply point out the absence of analysis; he must make some showing that his impairments, alone or in combination, equal a Listing. Masch v. Barnhart, 406 F. Supp. 2d 1038, 1051 (E.D. Wis. 2005); see also Sims v. Barnhart, 309 F.3d 424, 429 (7th Cir. 2002) (affirming where none of the evidence the ALJ allegedly ignored or misstated established disability under a Listing). Otherwise, remand would be pointless. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand

20

might lead to a different result.").

Plaintiff argues that there is strong evidence of equivalence to Listing 14.09D, which requires:

> Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.09D. Plaintiff contends that the record shows inflammatory arthritis with fatigue and malaise, and with limitations of activities of daily living due to vision problems and pain, and documented problems with concentration due to treatment. He argues that the ALJ failed to consider the combined effects of his spine disorder and vision problem to determine whether they rose to the level of severity required by this Listing.

The Commissioner, relying on Sims, responds that plaintiff has identified no material evidence ignored by the ALJ demonstrating that plaintiff's impairments equal the Listing. However, the ALJ's decision contains no discussion of pain, vision problems, and concentration deficits in conjunction with medical equivalence. Further, as discussed above, the ALJ failed to properly consider plaintiff's testimony bearing on these issues. I am cognizant of the requirement that I must read the ALJ's decision as a whole. It may in some cases "be a needless formality to have the ALJ repeat substantially similar factual analyses" at multiple steps of the analysis. Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004). In this case,

however, remand is warranted for reconsideration of medical equivalence based on the entire record.[10]

As the Commissioner notes, the ALJ considered the reports of the state agency consultants, see Scheck, 357 F.3d at 700 ("These forms conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.'") (quoting Farrell v. Sullivan, 878 F.2d 985, 990 (7th Cir.1989)), but the ALJ did not rely on those reports at step three.[11] Further, the consultants completed those reports in October 2007 and January 2008; obviously, they could not have considered Dr. Rosenthal's notes and treating source report, which were created later; nor could they have considered plaintiff's testimony. Plaintiff argues that given the new evidence the ALJ should have obtained a medical consultant opinion under SSR 96-6p. That Ruling requires the ALJ to obtain an updated medical opinion from a medical expert when additional medical evidence is received that in the opinion of the ALJ may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments. SSR 96-6p. Given the ALJ's evaluation of Dr. Rosenthal's report, it seems clear enough that the ALJ doubted it would change the consultants' view. On remand, however, the ALJ should on consideration of the entire record decide whether such an expert is required.

---

[10]This will include Dr. Rosenthal's report, which I discuss below.

[11]He did cite them as supportive of his RFC determination.

22

**C.     Treating Source Opinion**

Under SSA regulations, the opinion of a disability claimant's treating physician is entitled to special consideration.  See 20 C.F.R. § 404.1527(d)(2).  If the report is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the case record, it must be given "controlling weight."  20 C.F.R. § 404.1527(d)(2); SSR 96-2p;  Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011); Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  Even if the report does not meet the test for controlling weight, the ALJ may not simply reject it, SSR 96-2p; rather, he must determine the weight to give the opinion by considering a checklist of factors, Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008); Hofslien, 439 F.3d at 377, including (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention tending to support or contradict the opinion, 20 C.F.R. § 404.1527(d)(2).  Regardless of the weight the ALJ elects to give the treating source opinion, he must always "give good reasons" for his decision.  20 C.F.R. § 404.1527(d)(2); see also Punzio, 630 F.3d at 710 ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."); SSR 96-2p ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

In this case, the ALJ considered but largely rejected the report from plaintiff's treating

rheumatologist, Dr. Rosenthal.  As discussed above, Dr. Rosenthal opined that plaintiff's AS caused daily severe discomfort and interfered with his ability to concentrate, rest comfortably at night, move with ease, or sit still for longer than ten minutes.  She further opined that his pain medications interfered with his mental performance, and that he could lift no more than five pounds.  She concluded that "his ankylosing spondylitis currently significantly interferes with his ability to work." (Tr. at 342.)  In rejecting these severe restrictions on plaintiff's ability to lift, sit, and concentrate, the ALJ noted that while Dr. Rosenthal treated plaintiff from May 2008 to September 2009, her treatment notes mention no limitations on plaintiff's ability to sit, stand, walk, or lift.  Nor did Dr. Rosenthal set forth "objective findings" during her examinations to support these conclusions.  The ALJ also found the mild May 2008 MRI findings,[12] statements in the treatment notes that plaintiff was "doing well" on medication, and relatively normal examination results inconsistent with the proposed disabling limitations.  (Tr. at 58.)  Finally, the ALJ stated that Dr. Rosenthal offered no rationale or objective reasons for the degree of functional limitation expressed in the report, and plaintiff never complained to his doctors about the side effects of medication.  The ALJ therefore rejected Dr. Rosenthal's assessment of plaintiff's physical capacity.  (Tr. at 59.)  The ALJ also noted that the state agency consultants found that plaintiff could perform a limited range of light work, generally consistent with his more restrictive RFC.  (Tr. at 59.)

Plaintiff argues that the ALJ failed to first explain why he did not give the report controlling weight.  However, it is clear from the ALJ's opinion that he found Dr. Rosenthal's report unsupported by medically acceptable clinical and laboratory diagnostic techniques and

[12]Plaintiff did not undergo an MRI in May 2008.  Presumably, the ALJ meant the May 2008 x-rays ordered by Dr. Rosenthal.  (Tr. at 212, 214, 265.)

inconsistent with the other substantial evidence, including the state agency consultant reports, and thus not entitled to controlling weight.  See Buckhanon ex rel. J.H. v. Astrue, 368 Fed. Appx. 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").

Plaintiff argues that the ALJ was wrong to demand "objective findings," which are not required by SSR 96-2p.  That Ruling, which sets forth policy interpretation for giving controlling weight to treating source medical opinions, refers to "clinical signs and laboratory findings." And medical "signs," plaintiff notes, may include "symptoms" documented by a physician in a clinical setting.  Tyson v. Astrue, No. 08-cv-383, 2009 WL 772880, at *10 (W.D. Wis. Mar. 20, 2009) (citing Ortega v. Chater, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996); see also SSR 96-4p n.2 (explaining that when manifestations of an impairment, such as pain, fatigue, or weakness, represent an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, they represents a medical "sign" rather than a "symptom").  Whatever specific terminology is used in the regulations, the Seventh Circuit has held that an "ALJ need not give controlling weight to a treating physician's opinion if it is not supported by objective clinical findings."  Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999).  Further, as noted above, the ALJ's opinion here, fairly read, indicates that he did not give Dr. Rosenthal's report controlling weight; thus, the ALJ had to turn to the checklist of factors to determine what weight, if any, to give the report.  And under the checklist I can see nothing wrong with noting the absence of objective medical findings supporting the opinion. See 20 C.F.R. § 416.927(d)(3) & (4) (explaining that the more a medical source presents relevant evidence to support an opinion and the more consistent an opinion is with the record as a whole, the more weight the SSA will give to that opinion).  Plaintiff cites no authority for

his contention that the ALJ must use the specific phrases "medical signs" and "clinical diagnostic techniques," SSR 96-4p, rather than referring more colloquially to "objective findings." Nor was it improper for the ALJ to note the lack of "rationale or objective reasons for the degree of functional limitations" in the report. (Tr. at 59.) See 20 C.F.R. § 416.927(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Plaintiff argues that Dr. Rosenthal nevertheless did set forth numerous objective findings in her treatment notes and proceeds to review the notes. However, most of the findings plaintiff cites pertain to his diagnosis of AS (which the ALJ accepted) and related pain, stiffness, and restricted range of motion. He points to no findings in the notes supporting the specific restrictions at issue – on his ability to sit, stand, walk, or lift.

Plaintiff contends that the ALJ impermissibly "played doctor" in characterizing the May 2008 MRI findings as "mild" and inconsistent with disabling limitations. See Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). However, plaintiff fails to explain how the abnormalities seen on the MRIs, which seemed to baffle the doctors, support the limitations in Dr. Rosenthal's report. Further, as discussed in n.9, supra, plaintiff underwent no MRI in May 2008; the x-rays Dr. Rosenthal ordered at that time revealed only "[m]ild degenerative changes" at L2-L3 and L3-L4, erosive disease involving both sacroiliac joints, and hips "normally located."[13] (Tr. at 212, 265.) There was nothing wrong with the ALJ noting the "mild" changes recorded on the x-ray report.

---

[13]X-rays of plaintiff's shoulders taken at that time were unremarkable. (Tr. at 214, 265.)

Plaintiff faults the ALJ for relying on the exam findings showing a lack of swelling, full range of motion, and normal strength and alignment, without first establishing that these were definitive signs or symptoms of plaintiff's impairments. But plaintiff does not argue that Dr. Rosenthal did not, in fact, make these exam findings; nor does he specify which of these findings should be disregarded in evaluating his restrictions. Thus, it is hard to see how this could be any more than harmless error.

Plaintiff gains more traction with his argument that the ALJ failed to consider evidence contrary to his finding that plaintiff was "doing well" on medication. (Tr. at 58.) It is true that, at times, plaintiff reported doing well. But at other times he reported severe pain and his medications were increased. Most significantly, during his September 4, 2009 visit with Dr. Rosenthal, plaintiff reported doing worse, with severe stiffness and pain, unremedied by his pain pills. (Tr at 361.) Because plaintiff continued to have significant symptoms on methotrexate, Dr. Rosenthal elected to try another medication. (Tr. at 363.) Dr. Rosenthal prepared the report at issue just a few days later.

As indicated above, a reviewing federal court may not re-weigh the evidence or substitute its judgment for that of the ALJ, and the ALJ's failure to discuss every piece of evidence in the record does not require remand. See Jones, 623 F.3d at 1162. In this instance, however, the ALJ skipped over important evidence in the September 4, 2009 note, which undercuts the ALJ's belief that plaintiff's condition remained stable on medication. And just as this belief undercut the ALJ's credibility evaluation, so too did it appear to impact his evaluation of Dr. Rosenthal's report. Finally, as discussed above, the ALJ erred in stating that Dr. Rosenthal found that plaintiff did not need to lie down. (Tr. at 58.) Her report is silent as to plaintiff's need to lie down during the day. This constituted error in evaluating plaintiff's

27

testimony, which the ALJ claimed was inconsistent with the report, and may have also played a role in evaluating the report.

## D.    The VE

Where, as here, the claimant makes it to step five of the sequential evaluation process, "the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy." Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004). A VE's testimony can satisfy this burden, but the testimony must be reliable, Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008), and the VE qualified to give it, see Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002). Seizing on the confusion in the transcript about the VE's name, plaintiff argues that the ALJ's step five determination here lacks the support of reliable vocational evidence.

As indicated above, the hearing transcript lists the VE as "Alex Paterro" (Tr. at 11), and the ALJ addressed his vocational questions to "Mr. Paterro" (Tr. at 38). However, the VE testified that his qualifications were set forth in exhibit 7B, the resume for "Allen R. Searles." Allen Searles is the person the ALJ summoned to appear at the hearing, and the ALJ in his decision identifies the VE as Allen Searles. To add to the confusion, the hearing transcript indicates that the ALJ swore in "Mr. Seals."

I don't know what happened here. Perhaps the person who transcribed the tape recording of the hearing erred or otherwise misheard what the ALJ said. Maybe "Paterro" and "Searles/Seals" are the same person. In any event, as the Commissioner notes, plaintiff's counsel stated that she had no objection to the qualifications of the vocational expert who

testified at the hearing.[14]  (Tr. at 40.)  Courts have held that a claimant seeking judicial review cannot "contest the general qualifications of the VE after expressly conceding the qualifications in the hearing before the ALJ."  Yopp-Barber v. Commissioner of Social Sec., 56 Fed. Appx. 688, 689-90 (6th Cir. 2003); see also Donahue, 279 F.3d at 446; Rosic v. Commissioner of Social Sec., No. 1:09CV1380, 2010 WL 3292964, at *11 (N.D. Ohio Aug. 19, 2010) (citing Ledford v. Astrue, 311 Fed. Appx. 746, 757 (6th Cir. 2008); Ragsdale v. Shalala, 53 F.3d 816, 819 (7th Cir. 1995)).  Plaintiff argues that counsel's failure to raise the issue should be excused because the confusion did not surface until after the hearing, when the ALJ wrote his decision and the transcript was prepared.  However, counsel was present when the ALJ addressed the VE at the hearing, and the VE's resume was in the record, available to counsel, and admitted in evidence at the outset of the hearing without objection.  (Tr. at 15.)  Thus, counsel could have drawn the ALJ's attention to any discrepancy between the name the ALJ apparently called the VE at the hearing and the name on the resume.

Moreover, aside from generally noting that the ALJ must use a reliable vocational source at step five, plaintiff fails to specify how he was harmed.  He does not argue that the VE's testimony was unreliable, e.g., because a person with the limitations described by the ALJ in his hypothetical questions could not perform the jobs identified by the VE, or because the VE's testimony conflicts with the DOT.  Therefore, I would be disinclined to reverse on this ground alone.  However, because the matter must be remanded for other reasons, this mixup can be

---

[14]The notion that this was a transcription error or some similarly benign mix-up is supported by the fact that Allen Searles regularly testifies as a VE in social security cases in this district, see, e.g., Terry v. Astrue, 580 F.3d 471, 474 (7th Cir. 2009); McMurtry v. Astrue, 749 F. Supp. 2d 875, 877 (E.D. Wis. 2010), including in cases in which the claimant was represented by the same lawyer who appeared for plaintiff in this case, see, e.g., Nash v. Astrue, No. 10-C-353 (E.D. Wis.).

remedied on remand.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision **REVERSED**, and this matter is

**REMANDED** for further proceedings consistent with this decision.  The clerk is directed to enter

judgment accordingly.

Dated at Milwaukee, Wisconsin this 22nd day of July, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge